*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* BUNN, Minors.

UNPUBLISHED
April 30, 2019

No. 345776
Oakland Circuit Court
Family Division
LC No. 2017-859229-NA

Before: MURRAY, C.J., and SAWYER and REDFORD, JJ.

PER CURIAM.

Respondent-father appeals as of right the trial court's order terminating his parental rights to the minor children, CB, MB, and RB, pursuant to MCL 712A.19b(3)(b)(*i*), (j), and (k)(*iii*). We affirm.[1]

## I. FACTS

In keeping with the family's daily routine, during late September 2017, the minor children's mother left them in respondent's exclusive care while she worked at her job. When she returned from work, she noticed slight swelling of six-week-old RB's head. She decided to take RB to the hospital out of an abundance of caution. At the hospital, physicians diagnosed RB with a skull fracture and subarachnoid hemorrhage. Further examination revealed that RB also had several healing rib fractures and a healing fracture of the metaphyseal structure, the narrow portion of a large bone. A doctor concluded that RB's injuries were the result of non-accidental trauma, likely indicative of child abuse. She specifically opined that the injuries were not consistent with the explanations provided by respondent.

---

[1] During the child protection proceeding, the children remained in the care of R. Bunn, their biological mother and respondent's wife. Although respondent and Bunn remained married throughout the proceedings, Bunn was not identified as a respondent in the petition and she is not a party to this appeal.

During the Child Protective Services ("CPS") investigation that ensued, respondent initially reported that RB's head injury resulted from four-year-old CB jumping on the couch and hitting her head with his elbow. Respondent later reported that he dropped RB and she hit her head on the linoleum floor. Respondent admitted that he failed to seek medical attention for RB until the child's mother arrived home from work approximately an hour later.

This was not the first time one of the children suffered an injury while in respondent's exclusive care. In December 2013, CB, then nine months old, was treated for second-degree burns to his left hand. At the time, respondent explained that while he held the infant and boiled water, CB stuck his hand into the hot water. Another incident occurred in May 2016, when MB, then five months old, received treatment for first- and second-degree burns to her left foot, toes, calf, thigh, forearm, and hand. At the time, respondent offered the explanation that two-year-old CB pushed MB into a wall heater while she was confined to her "bouncy chair." The children's mother was not present during either the 2013 or 2016 events and in both instances respondent failed to seek medical attention for his injured children. CPS investigated the events but the children were not removed, no claims were substantiated, and no petitions were filed.

After RB's injuries were discovered, respondent, pursuant to a voluntary safety plan, moved out of the family home on September 29, 2017. On December 11, 2017, petitioner filed a petition seeking termination of respondent's parental rights at the initial disposition.[2] On December 12, 2017, the trial court entered an order formally removing respondent from the family home. The children were permitted to stay in the home and remain within the care and custody of their mother under DHHS supervision.

On March 12, 2018, for purposes of jurisdiction and statutory grounds, respondent pleaded no contest to the allegations in the petition. Thereafter, the trial court assumed jurisdiction and found that there existed statutory grounds to terminate respondent's parental rights. Specifically, the court found clear and convincing evidence to terminate respondent's parental rights pursuant to MCL 712A.19b(3)(b)(*i*), (j), and (k)(*iii*). The trial court ordered that respondent undergo a psychological evaluation in anticipation of a best-interest hearing. After a five-day hearing, the trial court found that termination of respondent's parental rights served the children's best interests. Accordingly, the trial court terminated respondent's parental rights to the children. Respondent now appeals that order.

On appeal, respondent does not challenge that there existed statutory grounds for termination of his parental rights. As such, we may presume that the trial court did not clearly err in finding that the unchallenged statutory grounds were established by clear and convincing evidence. *In re JS & SM*, 231 Mich App 92, 98-99; 585 NW2d 326 (1998), overruled in part on other grounds *In re Trejo*, 462 Mich 341; 612 NW2d 407 (2000).

Respondent challenges the trial court's decision that termination of his parental rights served the children's best interests on two grounds: 1) he argues that the trial court violated his

---

[2] Petitioner delayed filing the petition until it obtained the medical records and completed its investigation.

Fifth Amendment right against self-incrimination; and 2) he argues that the evidence weighed against termination of his parental rights. Both of respondent's arguments lack merit.

## II. STANDARD OF REVIEW

Once a statutory ground for termination has been proven, the trial court must find that termination serves the children's best interests before it can terminate parental rights. MCL 712A.19b(5); MCR 3.977(E)(4). A trial court must find by a preponderance of the evidence that termination serves the best interests of the children before it may terminate parental rights. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We review for clear error the trial court's determination that termination of respondent father's parental rights served the children's best interests. MCR 3.977(K); *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). A finding is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made. *Id*. We give deference to the "trial court's factual findings at termination proceedings if those findings do not constitute clear error." *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009). We also defer to the trial court's special opportunity to judge the credibility of witnesses. *In re HRC*, 286 Mich App 444, 459; 781 NW2d 105 (2009). We review de novo constitutional questions. *In re AMAC*, 269 Mich App 533, 536; 711 NW2d 426 (2006).

## III. ANALYSIS

Respondent argues that the trial court violated his Fifth Amendment right against self-incrimination because he believes that an inference can be drawn from remarks the trial court made that a key reason for the trial court's best-interests determination rested on respondent's lack of remorse for his role in the children's injuries and the only way that he could have expressed remorse would have been by incriminating himself. We disagree.

Because respondent did not assert a violation of his Fifth Amendment rights during the trial court proceedings, this issue is unpreserved. Accordingly, we review it for plain error affecting respondent's substantial rights. *In re Utrera*, 281 Mich App 1, 8-9; 761 NW2d 253 (2008). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *In re VanDalen*, 293 Mich App 120, 135; 809 NW2d 412 (2011) (quotation marks and citation omitted). An error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

In *In re Blakeman*, ___ Mich App ___; ___ NW2d ___ (2018) (Docket No. 341826), slip op at 8, this Court explained:

> The rights recognized by the Fifth Amendment of the United States Constitution include the guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." US Const, Am V. This provision applies to the states through operation of the Fourteenth Amendment, *People v Cheatham*, 453 Mich 1, 9; 551 NW2d 355 (1996) (Boyle, J.), citing *Malloy v Hogan*, 378 US 1; 84 S Ct 1489; 12 L Ed2d 653 (1964), and appears verbatim in the Michigan Constitution. Const 1963, art 1, § 17.

The constitutional protection is worded as one applicable to criminal cases, and thus it applies in any situation where a criminal prosecution might follow, regardless of how likely or unlikely such additional machinations may seem. See *United States v Miranti*, 253 F2d 135, 139 (CA 2, 1958) ("We find no justification for limiting the historic protections of the Fifth Amendment by creating an exception to the general rule which would nullify the privilege whenever it appears that the government would not undertake to prosecute."). Accordingly, "[t]he privilege can be claimed in *any proceeding*, be it criminal or civil, administrative or judicial, investigatory or adjudicatory." *People v Ferency*, 133 Mich App 526, 533; 351 NW2d 225 (1984), retaining italics and quoting *In re Gault*, 387 US 1, 47; 87 S Ct 1428; 18 L Ed2d 527 (1967) (quotation marks and citation omitted). Any testimony "having even a possible tendency to incriminate is protected against compelled disclosure." *People v Lawton*, 196 Mich App 341, 346; 492 NW2d 810 (1992). The privilege may be invoked even when criminal proceedings have not been instituted or even planned. *People v Guy*, 121 Mich App 592, 609-619; 329 NW2d 435 (1982). Here, although respondent has not been charged for assaulting the toddler, we can reasonably conclude that an inculpatory statement by respondent could be used in the future by the Ingham County prosecutor, and therefore, respondent is afforded the protections under the Fifth Amendment throughout the child protection proceedings.

In *In re Blakeman*, the respondent and his wife had four children. Occasionally the respondent's wife babysat an unrelated toddler. During one of these occasions the toddler was left in the respondent's care while the respondent's wife left to run an errand. When she returned, she found the toddler unresponsive. Ultimately, physicians diagnosed the toddler with a life-threatening skull fracture that they attributed to non-accidental trauma. At the adjudicative bench trial, the respondent was informed of his right against self-incrimination, but he waived that right and testified that he did not know the manner in which the toddler sustained the fractures. *Id.* at ___; slip op at 2. The respondent maintained his innocence. Nonetheless, the trial court found that the respondent fractured the toddler's skull. The trial court, thereafter, assumed jurisdiction of the children and ordered the respondent to participate in a treatment plan. *Id.* at ___; slip op at 2. The respondent substantially complied with and benefited from the services offered but the trial court refused to permit reunification because the respondent had not admitted responsibility for the toddler's injuries. In an interlocutory appeal, the respondent challenged a dispositional order that prohibited him from residing in the family home with his wife and four children. *Id.* at ___; slip op at 1.

On appeal, this Court explained that the respondent could not be compelled to incriminate himself and must be afforded the protections under the Fifth Amendment throughout the child protection proceedings. *Id.* at ___; slip op at 8. This Court held that, by requiring the respondent to confess to an act of criminal child abuse as a condition of reunification, the trial court violated his constitutional right against compelled self-incrimination. *Id.*

This Court observed that "the trial court gave respondent a Hobbesian choice to either (1) retract his claim of innocence, admit to the child abuse at therapy as a condition of completing services, and expose himself to criminal liability for child abuse, or (2) maintain his innocence,

which would likely result in the termination of his parental rights to his four children." *Id.* at ___; slip op at 9. This Court explained:

> We see no reason to conclude that there is a lack of compulsion simply because respondent initially waived his Fifth Amendment right, testified at the trial, and was then later compelled to retract his claim of innocence and incriminate himself. Compulsion occurs when a person is unable to remain silent unless he chooses to speak in the unfettered exercise of his own will. As the trial court explained, he had a choice to choose between his liberty interests or his children. Respondent chose the former, but any right to remain silent was no longer unfettered, and there was sufficient compulsion to be a witness against himself. [*Id.* at ___; slip op at 10 (quotation marks and citations omitted).]

\* \* \*

> By requiring respondent to confess to the criminal abuse of the toddler in order to regain care and custody of his children, the trial court was requiring an inculpatory admission against respondent's penal interests. This could also be self-defeating because such an admission may lead to criminal charges that end with him being taken away from his children due to incarceration. This practice offends due process when a respondent is required, on pain of being deprived of the care and custody of his children, to confirm the trial court's determination that he had committed severe child abuse. Even more, requiring respondent to admit to the child abuse after he had already testified at trial and denied any wrongdoing would subject him to possible perjury charges. The record clearly shows that the trial court violated respondent's Fifth Amendment right against self-incrimination when it conditioned unsupervised visitation and eventual reunification on respondent's admission to the child abuse. [*Id.* at ___; slip op at 11.]

In this case, respondent voluntarily and knowingly pleaded no contest to the allegations in the petition. Our Supreme Court explained that a voluntary and knowing no-contest plea "constitutes a waiver of several constitutional rights, including the privilege against compulsory self-incrimination, the right to a trial by jury, and the right to confront one's accusers." *People v Cole*, 491 Mich 325, 332; 817 NW2d 497 (2012) (citations omitted). The record also reflects that respondent voluntarily chose to testify in his case-in-chief after being fully advised of his Fifth Amendment right against self-incrimination. The record reflects that respondent denied that he intentionally injured his children but he admitted that he caused RB's skull fracture. He also admitted that CB and MB suffered serious injuries while in his care that required medical treatment at the hospital.

Respondent concedes that he did not face questions that required him to incriminate himself either during direct examination or cross-examination. The record reflects that throughout the proceedings in this case the trial court did nothing to compel respondent to admit that he had physically abused his children nor did the trial court condition reunification or its best-interest ruling on respondent's admissions that he caused injury to his children. The record does not reflect that the trial court threatened respondent with any consequence unless he incriminated himself by expressing remorse for his conduct at any time during the proceedings.

Respondent was not placed in the position where he had to make a Hobbesian choice and no reasonable inference can be drawn from the record that he was.

De novo review of the record in this case reveals that the trial court did not rely on respondent's lack of remorse for its determination of the children's best interests. The record reflects that the trial court made two passing references to witness testimony that respondent did not indicate remorse. The trial court did not emphasize that evidence or indicate that it relied on that evidence for its best-interests determination. The record does not establish plain error that affected respondent's substantial rights.

Respondent next argues that the trial court erred when it found, by a preponderance of the evidence, that termination of his parental rights served the children's best interests. We disagree.

When considering best interests, the trial court must focus on the children rather than the parent. *In re Moss*, 301 Mich App at 87. The trial court may consider several factors when deciding if termination of parental rights serves the children's best interests, including the children's bond to the parent, the parent's parenting ability, the children's needs for permanency, stability, and finality. *In re Olive/Metts,* 297 Mich App 35, 42; 823 NW2d 144 (2012). The trial court may also consider psychological evaluations, the children's ages, and continued involvement in domestic violence. *In re Jones,* 286 Mich App 126, 131; 777 NW2d 728 (2009). Further, the children's safety and well-being, including the risk of harm they might face if returned to the parent's care, constitute factors relevant to a best-interest determination. *In re VanDalen*, 293 Mich App at 142. Whether termination of parental rights serves the children's best interests must be proven by a preponderance of the evidence. *In re Moss,* 301 Mich App at 90.

In this case, the record reflects that the trial court considered the witnesses' testimonies and documentary evidence and applied the applicable best-interest factors. The evidence established that all three children sustained severe injuries while in respondent's exclusive care and control. RB sustained a skull fracture and subarachnoid hemorrhage, multiple rib fractures, and a fracture of the metaphyseal structure. The medical experts concluded that RB's injuries resulted from non-accidental trauma. The record reflects that, each time one of respondent's children became injured, respondent compounded matters and heightened his children's physical suffering by failing to promptly obtain medical treatment. The evidence further established that respondent proffered inconsistent explanations for the children's injuries and on at least two occasions placed blame on one of his children. The evidence established that all three children suffered significant injury while in respondent's sole care and remained at risk of harm if in respondent's care. Moreover, although respondent completed a parenting class, respondent's depression and detachment disorder impaired his ability to safely care for the children. The record reflects that respondent's detachment issues affected his parenting ability by limiting his capacity to empathize and by impairing his ability to put his children's needs above his own. The record indicates that respondent's serious mental health issues would not be resolved within a reasonable time considering the children's ages. The children needed a safe and stable home free from the threat of physical abuse and neglect. These factors weighed in favor of termination.

Evidence of a bond between respondent and his two older minor children existed but evidence did not establish that he had a bond with RB. The record reflects that respondent loved his children and he continued to provide financially for the family. Although this factor weighed against termination, the other applicable factors outweighed it. Accordingly, the trial court did not clearly err by finding that a preponderance of the evidence established that termination of respondent's parental rights served the children's best interests.

Affirmed.

/s/ Christopher M. Murray
/s/ David H. Sawyer
/s/ James Robert Redford